UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 20-20764-CIV-UNGARO/O'SULLIVAN

MARIA ROCHA,

       Plaintiff,

       v.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on the Plaintiff's Motion for Summary Judgment (DE #16, 08/10/2020) and the Defendant's Motion for Summary Judgment (DE #17, 09/09/2020). The plaintiff seeks a reversal and remand with instructions to the Commissioner to award benefits. In the alternative, the plaintiff seeks remand for further administrative proceedings. The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 405(g) and is properly before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA"). This matter was referred to the undersigned pursuant to 28 U.S.C. § 636 (c) by the clerk's Notice of Judge Assignment (DE #2, 02/21/2020). Having carefully considered the filings and applicable law, the undersigned recommends that the Plaintiff's Motion for Summary Judgment (DE #16, 08/10/2020) be granted and the Defendant's Motion for Summary Judgment (DE #17, 09/09/2020) be denied, and the matter be remanded in accordance with the following Report and Recommendation.

## PROCEDURAL HISTORY[1]

On February 24, 2017, Maria Rocha (hereinafter "the plaintiff"), filed an application for Supplemental Security Income ("SSI"). (Tr. 26). In her application, the plaintiff alleged disability with an onset date of February 8, 2017. (Tr. 80-81). After a hearing, an Administrative Law Judge ("ALJ") found that: (1) the plaintiff had not engaged in substantial gainful activity since the SSI application date; (2) the plaintiff's "major depressive disorder; anxiety disorder; posttraumatic stress disorder (PTSD) and headaches" were severe impairments; (3) the plaintiff did not have an impairment or combination of impairments that met or equaled the criteria of the listed impairments listed in 20 CFR Part 404; (4) the plaintiff had the residual functional capacity ("RFC") to perform "a full range of work at all exertional levels," but with some nonexertional limitations;[2] and (5) the plaintiff had no past relevant work, but could perform a significant number of jobs in the national economy. (Tr. 28-37). On February 25, 2019, the ALJ concluded that the plaintiff was not disabled under 1614(a)(3)(A) of the Social Security Act. (Tr. 38). On June 26, 2019, the Appeals Council denied the plaintiff's request for review rendering the ALJ's decision as the Social Security Commissioner's final determination. (Tr. 6-8). The plaintiff filed her complaint in this action on February 21, 2020. (DE #1, 2/21/2020). The plaintiff filed her Motion for Summary Judgment on August 10, 2020, (DE # 16, 08/10/2020), and the defendant filed his motion for Summary Judgment on September 9, 2020. (DE #17, 09/09/2020).  The

---

[1] All references to "Tr." refer to the transcript of the Social Security Administration. (DE #10, 05/11/2020). The page numbers listed on this document refer to the bold numbers found in the lower right-hand corner of each page of the transcripts, as opposed to those assigned by the court's electronic docketing system or any other page numbers.

[2] The nonexertional limitations include: "tasks without strict production pace; must avoid concentrated exposure to vibration and hazards including work at unprotected heights; non-tandem tasks with only occasional interaction with coworkers; and occasional to superficial interaction with the general public."

plaintiff filed a response to the defendant's Motion for Summary Judgment on October 13, 2020.
(DE # 21, 10/13/20).

**FACTS**

**I. The Plaintiff's Background**

The plaintiff was born in 1975 and was 41 years old when she filed her application for
Social Security benefits on February 24, 2017. (Tr. 48). The plaintiff alleged a disability onset
date of February 8, 2017, due to anxiety disorder; major depressive disorder; post-traumatic
stress; uterine leiomyoma; cyst of the ovary; abnormal uterine bleeding; thyroid nodule; platelet
disorder; bloating symptoms; and panic attacks. (Tr. 80-81). The plaintiff received psychiatric
treatment for panic disorder and agoraphobia. (Tr. 53, 57). The plaintiff completed high school
and has prior work experience as an assembler at a factory and as a data entry clerk. (Tr. 90, 261-
268, 493). The plaintiff is married and has a son.  The plaintiff's husband takes care of the
plaintiff's son when the plaintiff is in too much pain to do so. (Tr. 251-52, 309-11).  The plaintiff
sees a friend about once a week, but "[the plaintiff] does not want to come out of the house." (Tr.
312-13).

**II. Medical Evidence**

**A. Dr. Ares-Romero/Dade Family Counseling Clinic**

The plaintiff's relevant medical record starts in 2013 when she sought psychiatric
treatment at Dade Family Counseling Clinic and reported panic attacks. (Tr. 357-360). When the
plaintiff first visited the clinic and saw Dr. Patricia Ares-Romero, M.D., the plaintiff had
previously been treated for panic attacks and agoraphobia. (*Id.*). The plaintiff reported to Dr.
Ares-Romero that her panic attacks began post-partum and stated that she was "unable to
maintain a job" because she was frightened that her panic attacks would recur. (Tr. 358). At the

plaintiff's first meeting with Dr. Ares-Romero, Dr. Ares-Romero's mental examination indicated that: (1) the plaintiff's appearance was appropriate; (2) the plaintiff was alert, but restless and fidgety; (3) the plaintiff's speech was coherent and her memory intact; and (4) the plaintiff's mood was anxious. (*Id.*). At that time, the plaintiff was prescribed several medications. (Tr. 359).[3] By February 26, 2014, the plaintiff reported that she ran out of medication due to a lack of insurance coverage but continued to receive medical treatment with Dr. Ares-Romero. (Tr. 363). On May 6, 2015, Celexa was substituted for Cymbalta, the plaintiff's dosage of Kronospan increased, and sertraline (Zoloft) was added as one of her medications. (Tr. 369-74).

The plaintiff was still seeing Dr. Ares-Romero on March 31, 2016. (Tr. 376). Dr. Ares-Romero counseled the plaintiff on the importance of taking and increasing her medication to continue improving her symptoms. (*Id.*). Dr. Ares-Romero also noted that the plaintiff had made "minimal improvement" with her anxiety and panic attacks. (Tr. 378).

### B. Alexandra Rodriguez, MFT/ Borinquen Medical Centers

On September 8, 2016, the plaintiff started receiving mental health treatment and counseling for initial diagnoses of Major Depressive Disorder, single episode, unspecified and Post-traumatic Stress Disorder ("PTSD") at Borinquen Healthcare Center. (Tr. 392). The plaintiff's medications were changed to Clonazepam, trazadone, and a larger dosage of Effexor and she began seeing a marriage and family therapist ("MFT"), Alexandra Rodriguez, for therapy. (Tr. 389-92). Ms. Rodriguez noted that the plaintiff was very depressed and anxious. (Tr. 384). The notes indicate that the plaintiff was having conflict with her husband and that the

---

[3] The medications prescribed included Klonopin, Paxil, Lexapro, Cymbalta, and Wellbutrin. However, other medications were added at later dates, and the prescriptions occasionally changed until the alleged onset date. Some of the other medications prescribed include Librax, Clonazepam, and Sertraline (Zoloft).

plaintiff had discontinued her Effexor medication because of negative side effects. (*Id.*).  The notes also indicate that after consulting Dr. Navarro, Dr. Navarro recommended continuing the medicine because the side effects are often temporary. (*Id.*). On November 10, 2016, the plaintiff returned to see Ms. Rodriguez after she missed a "long period" of sessions. (Tr. 389-91). At the aforementioned appointment, the plaintiff conveyed that one of the biggest stressors was not being able to effectively communicate with her 11-year-old son. (*Id.*). During the same meeting, Ms. Rodriguez relayed the importance of attending appointments and worked with the plaintiff on techniques to improve her communication skills. (*Id.*). On December 22, 2016, Ms. Rodriguez reported that the plaintiff "appeared very depressed and anxious." (Tr. 480). The notes indicate that the plaintiff stated that she was having conflicts with her husband and that she stopped taking her Effexor medication because she experienced unpleasant side effects. (*Id.*). Ms. Rodriguez consulted Dr. Navarro about the plaintiff's medication discontinuation, and Dr. Navarro advised that the plaintiff continue her Effexor medication as side effects were usually temporary. (*Id.*).

The plaintiff continued to meet with Ms. Rodriguez on a consistent basis in 2017. On January 20, 2017, the plaintiff reported again that she felt depressed, but was initially resistant to identify why she was depressed. (Tr. 478). When asked if she wanted to harm herself, the plaintiff began crying and explained that her family's economic situation and her son's behavior at school were "devasting" her. (*Id.*). However, the plaintiff denied any wish to harm herself. (*Id.*). In separate meetings on February 2, February 10, March 8, and April 6, of 2017, Ms. Rodriguez noted that the plaintiff's progress toward current treatment goal(s) were either "none" or "minimal." (Tr. 451, 462, 466, 473). In the plaintiff's meeting with Ms. Rodriguez on March 23, 2017, the plaintiff reported that she felt much better. (Tr. 460). During the same meeting, the

plaintiff's Effexor dosage was reduced from 150 milligrams to 75 milligrams because the plaintiff was concerned over its side effects. (*Id.*). At the next meeting with Ms. Rodriguez on April 6, 2017, the plaintiff relayed that the change in her medication dosage made her feel much better. (Tr. 451). The plaintiff also reported feeling better overall and had the energy and desire to do more around the house. (*Id.*). Ms. Rodriguez noted that the plaintiff's progress toward the treatment goal was minimal, but also encouraged the plaintiff to take advantage of her boost in energy and plan new activities. (*Id.*). On April 26, 2017, Ms. Rodriguez noted that the plaintiff "came to [the] session in a good mood," but that the plaintiff had minimal progress toward the treatment goal. (Tr. 449). In July of 2017, Ms. Rodriguez also noted that the plaintiff reported that her headaches had worsened. (Tr. 649).

In 2018, the plaintiff continued her sessions with Ms. Rodriguez. By February 27, 2018, the plaintiff reported sleeping better, but she was still reluctant to leave the house except for doctors' appointments. (Tr. 700). Ms. Rodriguez continued working with the plaintiff on building coping mechanisms and developing skills so plaintiff could deal more positively with her anxiety and depression. (Tr. 683, 698). However, throughout 2018, the plaintiff continued to report depression, anxiety, and panic attacks at her sessions with Ms. Rodriguez. (Tr. 696, 698). Additionally, on February 21, March 20, and April 10 of 2018, Ms. Rodriguez noted that the progress towards the plaintiff's treatment goals were either "none" or "minimal." (Tr. 694, 696, 700).

### C. Dr. Gilbert Smith D.O./Borinquen Medical Centers

On January 24, 2017, Dr. Gilbert Smith, a psychiatrist, met with the plaintiff. (Tr. 474). Dr. Smith noted that the plaintiff was "feeling ok" and her visit was a follow-up meeting for medication management. (Tr. 476). After assessing the plaintiff's mental status, Dr. Smith

recorded that the plaintiff had an "appropriate" appearance, good eye contact, good attention span/concentration, was oriented (in time, place, person), aware of current and past events, a euthymic mood, and an "appropriate" affect. (*Id.*). In the auto-fill section of his evaluation, Dr. Smith reported normal mental status examination with no symptoms and also noted that the plaintiff had a normal speech rate and speech volume, a logical thought process, intact associations, no abnormal or psychotic thoughts, good judgment, and good insight. (*Id.*). At the same appointment, Dr. Smith's narrative portion of the treatment notes also indicate that the plaintiff had made minimal progress toward treatment goals and that the plaintiff "states she is not feeling better with the medications." (*Id.*). Additionally, on May 19, 2017, Dr. Smith noted that the plaintiff had made minimal progress toward treatment goals and in the session notes, Dr. Smith documented that the plaintiff "states she is not feeling better." (Tr. 549).

Dr. Smith increased the plaintiff's Effexor dosage from 75 milligrams a day to 150 milligrams daily and increased her clonazepam prescription from 1 milligram to 2 milligrams. (*Id.*). Dr. Smith noted that the plaintiff suffered from major depressive disorder, post-traumatic stress disorder, nightmares, and panic attacks. (Tr. 477). When the plaintiff went to see Dr. Smith again on May 19, 2017, Dr. Smith noted that the plaintiff's appearance was appropriate, her eye contact was good, her attention/concentration was good, and she was oriented to time, place, and person.  (Tr. 548-49).  In addition, the plaintiff's fund of knowledge and memory were normal, her mood was euthymic, her affect was appropriate, her speech was normal, her thought process was logical, her associations were intact, she had no abnormal or psychotic thoughts, her judgement was good, and her insight was good. (Tr. 548-49).

### D. Mirentxu Leiva, Psy.D.

In May 2017, the Office of Disability Determination requested that psychologist Mirentxu Leiva evaluate the plaintiff. (Tr. 493). After the evaluation, Dr. Leiva diagnosed the plaintiff with Unspecified Anxiety Disorder, but noted that "no cognitive deficits were evidenced." (Tr. 494). When assessing the plaintiff, Dr. Leiva made numerous observations and noted: (1) the plaintiff was appropriately dressed and groomed; (2) the plaintiff did not appear to be in acute emotional distress at the time; (3) the plaintiff's speech was adequate in tone, rate and volume; (4) the plaintiff's thought process behavior was within normal limits; (5) the plaintiff had adequate eye contact; (6) the plaintiff's posture was within normal limits; (7) the plaintiff's mood and affect were mildly anxious; (8) "flight of ideas or loose associations was not apparent or reported", and (9) the plaintiff's attention and concentration, immediate memory, remote memory, abstract abilities, judgment, and "fund of information" were all adequate. (*Id.*). The plaintiff's delayed memory, computation skills, and concept formation were limited. (*Id.*). Dr. Leiva indicated that her evaluation of the plaintiff was an adequate representation of the plaintiff's level of functioning at that time. (*Id.*).

### E. Dr. Monica King

On May 22, 2017, a state agency psychological consultant Monica King, Psy.D., completed a mental RFC assessment on the plaintiff. (Tr. 66-77). Dr. King reviewed the plaintiff's medical records and determined she was not significantly limited in: (1) the ability to carry out short and simple instructions; (2) the ability to carry out detailed instructions; (3) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) the ability to sustain an ordinary routine without special supervision; (5) the ability to make simple work-related decisions; (6) the ability to ask simple

questions and request assistance; (7) the ability to accept instructions and respond appropriately to criticism from supervisors; (8) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (9) the ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (10) the ability to be aware of normal hazards and take appropriate precautions; (11) the ability to travel to unfamiliar places or use public transportation; and (12) the ability to set realistic goals or make plans independently of others. (Tr. 73-74). Dr. King also opined that the plaintiff is moderately limited in: (1) her ability to maintain attention and concentration for extended periods; (2) her ability to work in coordination with or in proximity to others without being distracted; (3) her ability to complete a normal workday and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) her ability to interact appropriately with the general public; and (5) her ability to respond appropriately to changes in the work setting. (*Id.*). Dr. King also noted that the plaintiff is "mentally capable of independently performing basic, routine tasks on a sustained basis" and "would benefit from a low-demand social setting." (Tr. 75). Dr. King found that with respect to the plaintiff's ability to perform past relevant work, even though a finding about the plaintiff's capacity for past relevant work had not been made, the information was not material because "all potentially applicable Medical-Vocational Guidelines would direct a finding of 'not disabled' given the [plaintiff's] age, education and RFC." (Tr. 75-76). Dr. King, therefore, concluded that the plaintiff can adjust to other work. (Tr. 75).

### F. Keith Bauer, Ph.D. and Isaac More, M.D.

Keith Bauer, Ph.D., conducted a supplemental disability evaluation on the plaintiff on August 16, 2017. (Tr. 85-89). Dr. Bauer completed a Medically Determinable Impairments and

Severity (MDI) form. (*Id.*). With respect to the plaintiff's sustained concentration and persistence limitations, Dr. Bauer determined that the plaintiff was not significantly limited in: (1) the ability to carry out very short and simple instructions; (2) the ability to carry out detailed instructions; (3) the ability to perform activities within a schedule, maintain regular attendance, or be punctual in customary tolerances; (4) the ability to sustain an ordinary routine without special supervision; (5) the ability to make simple work-related decisions; (6) the ability to ask simple questions, request assistance, or accept instructions and respond appropriately to criticism from supervisors; (7) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (8) the ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (9) the ability to be aware of normal hazards and take appropriate precautions; (10) the ability to travel to unfamiliar places or use public transportation; and (11) the ability to set realistic goals or make plans independently of others. (Tr. 88-89). Dr. Bauer also opined that the plaintiff was moderately limited in: (1) maintaining concentration for extended periods; (2) her ability to work in coordination with or in proximity to others without being distracted by them; (3) the ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of length of rest periods; (4) the ability to interact appropriately with the general public; and (5) the ability to respond appropriately to changes in the work setting. (*Id.*).

On August 18, 2017, in a medical evaluation that was part of a disability determination, Isaac Moore, M.D. found that the plaintiff has a number of impairments, none of which are severe. (Tr. 85). Dr. Moore indicated that the plaintiff's allegations were consistent with her complaints, but the findings were not severe. (*Id.*). After the second assessment discussed above,

on August 18, 2017, Dr. Moore signed off on a determination finding the plaintiff was not disabled. (Tr. 91).

### G. Nancy Navarro-Gonzalez, M.D., Borinquen Health Center, Inc.

Prior to meeting directly with the plaintiff, psychiatrist Dr. Nancy Navarro-Gonzalez, M.D. signed off on an evaluation given by Dr. Smith on May 19, 2017. (Tr. 549). Dr. Navarro-Gonzalez signed off on the May 19, 2017, examination from Dr. Smith, which showed that the plaintiff's appearance was appropriate, eye contact was good, attention/concentration was good, the plaintiff was fully oriented x3 (time, place, person), her fund of knowledge and memory were normal, her mood was euthymic, affect was appropriate, speech was normal, thought process was logical, associations were intact, there were no abnormal or psychotic thoughts, judgement was good and insight was good. (*Id.*).

On September 14, 2017, the plaintiff directly saw Dr. Navarro-Gonzalez. (Tr. 709). Dr. Navarro-Gonzalez's notes initially indicated that the plaintiff was "feeling okay." (*Id.*). The notes of Dr. Navarro-Gonzalez's later indicate that the plaintiff felt hopeless and helpless, and she was unable to work or seek a job. (Tr. 711). Dr. Navarro-Gonzalez's notes further indicate that the plaintiff was unable to purchase Cymbalta due to lack of insurance or funds, and that "Effexor [was] not helping anymore." (*Id.*). Dr. Navarro-Gonzalez's notes list the disorders of: (1) general anxiety disorder; (2) post-traumatic stress disorder; (3) panic attacks; (4) nightmares; and (5) major depressive disorder. (*Id.*). The plaintiff's medications of Amitriptyline 25 mg, Clonazepam 2 mg twice daily, and prazosin 1 mg were continued, but Dr. Navarro-Gonzalez discontinued the plaintiff's Effexor prescription. (*Id.*).

The plaintiff met again with Dr. Navarro-Gonzalez on February 21, 2018. (Tr. 701-05). During the appointment, the doctor noted that the plaintiff: (1) had a depressed mood and sad

affect; (2) reported "not feeling well;" and (3) was feeling depressed, hopeless, and helpless. (Tr. 701, 703). On June 27, 2018, Dr. Navarro-Gonzalez noted that the plaintiff came in with an anxious mood and affect, and that the plaintiff stated she had "good and bad days" but was taking more Clonazepam. (Tr. 692).

Dr. Navarro-Gonzalez completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) evaluation of the plaintiff on January 24, 2019. (Tr. 716-718). Dr. Navarro-Gonzalez opined that the plaintiff had moderate limitations regarding interacting appropriately with the public and carrying out simple instructions. (Tr. 716-717). Dr. Navarro-Gonzalez also opined that the plaintiff had marked limitations regarding: (1) understanding and remembering simple instructions; (2) the ability to make judgments on simple work-related decisions; (3) understanding and remembering complex instructions; (4) the ability to make judgments on complex work-related decisions; (5) interacting appropriately with supervisors; (6) interacting appropriately with co-workers; and (7) responding appropriately to usual work situations and to changes in a routine work setting. (*Id.*).

### H. Ignacio Zabaleta, M.D., Borinquen Health Center, Inc.

On October 23, 2018, psychiatrist Ignacio Zabaleta, M.D., noted the plaintiff had made minimal progress toward her treatment goals but had a normal mental status examination. (Tr. 684-90). The doctor also noted that the plaintiff "was tearful during interview." (Tr. 686). The plaintiff reported that she had "a strange sensation in her chest for the past four months since starting Amitriptyline" and as a result was only taking it every other day. (*Id.*). Her cardiologist recommended a stress test and "after watching the procedure on the internet, she became frightened and continues to postpone it" but "did report she has decided she will do the stress test." (*Id.*). The plaintiff reported "fluctuating mood, saying she has good days and bad days"

with the bad days occurring five times a month for a day at a time, and with "anhedonia, social isolation, crying spells, and passive thoughts about death." (*Id.*). The plaintiff reported "feeling very anxious occasionally" but responded well to Clonazepam. (*Id.*). The plaintiff was instructed to take amitriptyline 10 mg daily, and her medications were continued. (R. 684-86).

**I. Maelyn Camacho, M.D., Borinquen Health Center, Inc.**

On August 19, 2017, Maelyn Camacho, M.D., provided a general medical examination of the plaintiff and also noted the plaintiff's report of depression. (Tr. 588-89). Dr. Camacho initially noted "migraines (no ongoing episodes)" but then noted that the plaintiff had a history of migraines and "[complained of] worsening [headache]s [in] frequency and severity;" Dr. Camacho referred her to a neurologist for her headaches. (*Id.*).

**J. Jose Luis Gonzalez, M.D., Borinquen Health Center, Inc.**

October 5, 2017, neurologist Jose Luis Gonzalez, M.D., examined the plaintiff due to headaches with a history of migraines, and an onset three months prior with pain that "has increased in intensity."[4] (Tr. 649-58). The plaintiff reported headaches that had remained the same for the last 20 years, and described as "pressure sensation, temporal and above the eyes. [H]eadache can last from a few hours to a few days," with photophobia, phonophobia, and nausea. (Tr. 651). At that time, her headaches occurred two to three times a week, and were not relieved by up to six Tylenol or Excedrin daily. (*Id.*). The plaintiff stated that her headaches were not as severe with Effexor 75 mg (venlafaxine); the plaintiff also stated that she was unable to tolerate both Effexor and amitriptyline 25 mg together because she was "exhausted", and prazosin was substituted for worsening nightmares. (*Id.*). The plaintiff also reported anxiety and depression starting after the birth of her son. (*Id.*). In the Assessment/Plan portion of the notes,

---

[4] The undersigned notes that three months prior to October 5, 2017, when the headache pain increased, was July 2017.

Dr. Gonzalez indicated that the plaintiff had a "history of severe anxiety/depression" and was "coming for evaluation of headaches." (Tr. 653). The doctor noted that the headaches have some migranous features but appear more related to her uncontrolled anxiety and occasional panic attacks, with a component of medication overuse headaches." (*Id.*). Dr. Gonzalez prescribed amitriptyline 20 mg and sumatriptan 25 mg to take at onset of headache with a maximum of 100 mg in 24 hours. (Tr. 650, 653).

### K. The Plaintiff's Hearing Testimony

On February 6, 2019, the plaintiff testified at the ALJ hearing. (Tr. 46-60). The plaintiff stated that she lives with her husband and son, does not drive, and stopped working in 2002. (Tr. 49-51). The plaintiff also stated that her therapy was not working "much", she was still having panic attacks, and was continually working with Ms. Rodriguez, the plaintiff's therapist. (Tr. 51-52). Regarding her medication, the plaintiff indicated that her medicine was not working "much". (Tr. 53-54). Additionally, the plaintiff explained that she suffered from side effects from the medications, including stomach pains and headaches. (Tr. 54).

Regarding her daily activities, the plaintiff stated that she infrequently leaves her house, but occasionally takes the bus, goes to church services, prays, spends time with a friend, goes to the mall, completes chores, and watches television. (Tr. 50, 54-55, 59). When asked about her headaches, the plaintiff stated that over the past two years, her headaches would occur approximately three times a month and would typically last between four hours and a full day. (Tr. 59-60). The plaintiff also repeatedly stated that her migraines/headaches lasted at least half a day to more than a day, and resulted in the need to lie down, phonophobia, photophobia, and nausea, in addition to severe pain. (Tr. 60, 251, 299-300, 306, 651). The plaintiff also indicated that her anxiety and depression impaired her ability to leave the house except on a rare basis or

consistently perform basic activities of daily living such as cooking and bathing; additionally, the plaintiff's tasks of leaving the house for church, housework, and walking were part of her therapy to confront her depression and anxiety. (Tr. 55-56, 58, 256-57, 275, 302, 375, 449, 451, 544, 700, 705).

### L. The Vocational Expert's (VE) Testimony

Heidi Feder, a vocational expert ("VE"), testified at the February 6, 2017, hearing. (Tr. 61-63). Ms. Feder stated that there are jobs in the national economy for hypothetical people who: (1) have no past relevant work; (2) are able to work at all exertional levels; (3) require tasks without strict production pace, with only occasional interaction with the general public; (4) would need to avoid concentrated exposure to vibration and hazards including work at unprotected heights. (Tr. 61-62). Ms. Feder opined such individuals could work as: (1) a kitchen helper; (2) a day worker; or (3) a linen room attendant. (Tr. 62). The VE also stated that such hypothetical individuals could perform the aforementioned jobs with non-tandem tasks, only occasional interaction with co-workers, and occasional to superficial interaction with the general public. (*Id.*).

The VE opined that there are no jobs available in the economy for individuals who would also be off task 20 percent of the workday due to lack of concentration, pain, and the effects of medication. (Tr. 63). The VE also testified that the allowable absentee rate for the jobs she listed was one day a month. (*Id.*).

### ALJ'S DECISION-MAKING PROCESS

"Disability" is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in

death, or has lasted or can last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(I); 423(d)(1); 20 C.F.R. § 404.905. The impairment(s) must be severe, making the plaintiff "unable to do his previous work . . . or any other kind of substantial gainful work which exists in the national economy . . .." 42 U.S.C. § 423 (d)(1); 20 C.F.R. §§ 404.905-404.911.

To determine whether the plaintiff is entitled to disability benefits, the ALJ must apply a five-step analysis. 20 C.F.R. §§ 404.1520(a)-(f). The ALJ must first determine whether the plaintiff is presently employed or engaging in substantial gainful activity (SGA). 20 C.F.R § 404.1520(a)(4)(i). If so, a finding of non-disability is made, and the inquiry ends. (*Id.*).

Second, the ALJ must determine whether the plaintiff suffers from a severe impairment or a combination of impairments. 20 C.F.R § 404.1520(a)(4)(ii). If the plaintiff does not, then a finding of non-disability is made, and the inquiry ends. (*Id.*).

Third, the ALJ compares the plaintiff's severe impairments to those in the listings of impairments located in Appendix I to Subpart 404 of the Code of Federal Regulations. 20 C.F.R. § 404.1520(a)(4)(iii); § 404.1520(d), subpart P, Appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulation requires a finding of disability without further inquiry into the plaintiff's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518 n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. § 404.1520(d).

Fourth, the ALJ must determine whether the plaintiff has the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). RFC is defined as "what you can do despite your limitations." 20 C.F.R. § 404.1545(a)(1). This determination takes into account "all relevant evidence," including medical evidence, the

claimant's own testimony and the observations of others. (*Id.*). If the plaintiff is unable to perform his or her past relevant work, then a prima facie case of disability is established and the burden of proof shifts to the Commissioner to show at step five that there is other work available in the national economy which the plaintiff can perform. 20 C.F.R. § 404.1520(e); *See Barnes v. Sullivan*, 932 F.2d 1356, 1359 (11th Cir. 1991) (holding the claimant bears the initial burden of proving that he is unable to perform pervious work).

Fifth, the ALJ must determine whether the plaintiff is able to do any other work. The ALJ must consider the plaintiff's RFC, age, education, and work experience and determine if the plaintiff can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can make an adjustment to other work, the ALJ will find them not disabled. (*Id*). If the claimant cannot make an adjustment to other work, the ALJ will find them disabled. (*Id.*).

## THE ALJ'S FINDINGS

In a decision dated February 25, 2019, the ALJ found that the plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act. (Tr. 26-43). At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity ("SGA") since the date of the application, February 24, 2017. (Tr. 28).

At step two, the ALJ found that the plaintiff had the following severe impairments: major depressive disorder; anxiety disorder; post-traumatic stress disorder (PTSD); and headaches. (*Id.*). The ALJ also found that the plaintiff had the following non-severe impairments: (1) female productive issues (the claimant reported she did not think this was disabling); (2) endometriosis, ovarian cyst, and uterine leiomyoma; constipation and thyroid cyst/nodule with normal thyroid function tests; (3) platelet disorder and bloating; and (4) hand cramps and pain in the left arm in 2018. (*Id.*). At step three, the ALJ found that the plaintiff does not have an impairment or

combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926). (Tr. 29). The ALJ then found that the plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: tasks without strict production pace; must avoid concentrated exposure to vibration and hazards including work at unprotected heights; non-tandem tasks with only occasional interaction with coworkers; and occasional to superficial interaction with the general public. (Tr. 30). The ALJ noted that the RFC assessment was supported by the evidence of record and consideration was given to the plaintiff's daily activities, the nature of the plaintiff's symptoms, the precipitating and aggravating factors, the plaintiff's medication, and the plaintiff's "treatment or other measures to relieve symptoms." (Tr. 36).

At step four, the ALJ determined that the plaintiff has no past relevant work. (*Id.*) At step five, the ALJ indicated that considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform. (20 CFR 416.969 and 416.969a); (Tr. 37).

## STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, the Court must determine whether it is appropriate to grant either party's motion for summary judgment. Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *see Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996) (holding that the reviewing court must not reweigh evidence or substitute their discretion). On judicial review, decisions made by the Commissioner of Social Security are conclusive if supported by

substantial evidence and if the correct legal standard was applied. 42 U.S.C. § 405(g); *See Kelley v. Apfel*, 185 F.3d 1211, 1213 (11th Cir. 1999). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). In determining whether substantial evidence exists, "the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).

The restrictive standard of review, however, applies only to findings of fact, no presumption of validity attaches to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991) (holding that a "[c]ommissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."); *accord Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

The reviewing court must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *See Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). The court may not, however, decide the facts anew, reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence weighs against the Commissioner's decision the reviewing court must affirm if the decision is supported by substantial evidence. *See Miles*, 84 F.3d at 1400; *see also Baker v. Sullivan*, 880 F.2d 319, 321 (11th Cir. 1989). Factual evidence is presumed valid, but the legal standard applied is not. *See Martin*, 894 F.2d at 1529. The Commissioner must apply the correct legal standard with sufficient reasoning to avoid reversal. (*Id.*).

**LEGAL ANALYSIS**

The plaintiff contends that the ALJ erred for the following reasons: (1) the evaluation of the medical opinion evidence of record is unsupported by substantial evidence; (2) the decision does not sufficiently address headache-related limitations; and (3) the rationale for rejecting the plaintiff's allegations is unsupported by substantial evidence. (DE #16, 08/10/2020, at 13-22).

The plaintiff asserts that the ALJ erred in rejecting the opinions from all treating and examining sources for reasons not supported by substantial evidence.  (DE #16, 05/11/2020, at 13). In the absence of good cause "for not heeding a treating physician's diagnosis[,]" a treating physician's opinion must be accorded substantial weight. *Edwards v. Sullivan*, 937 F2d 580, 583 (11th Cir. 1991). "Good cause exists 'when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'" *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (internal citation omitted). When the treating source opinion is not accorded controlling weight, the ALJ must consider and weigh a medical source statement according to the factors found under 20 C.F.R. § 416.927(c)(2)-(6). An ALJ "must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The undersigned finds that the ALJ's findings are not supported by substantial evidence and a remand is warranted.

I.   **The Evaluation of the Medical Opinion Evidence of Record is Unsupported by Substantial Evidence**

Generally, where there is any conflict, inconsistency, ambiguity or insufficiency in the evidence, the ALJ is required to order a consultative examination to fully and fairly develop the

record. *See Cox v. Astrue*, 933 F. 2d 169, 177 (N.D. N.Y. 2012).  However, the burden is on the claimant to prove he is disabled. *See* 20 C.F.R. § 404.1512(a). Further, an ALJ's duty to develop the record includes making "every reasonable effort" to recontact the treating source "if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record." SSR 96-5p, 1996 WL 374183, at *6 (July 2, 1996). In evaluating the necessity to remand a claim for further development of the record, one must show that "the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.'" *See Brown v. Shalala*, 44 F. 3d 931, 935 (11th Cir. 1995).

The plaintiff emphasizes that the ALJ rejected the opinion of treating psychiatrist Dr. Navarro-Gonzalez and accorded "little weight" for unsupported reasons. (DE #16, 05/11/2020, at 14). The plaintiff asserts that the ALJ discredited Dr. Navarro-Gonzalez's opinion as "inconsistent with her own treatment records that report some completely normal mental status exams." (*Id.*). The plaintiff first argues that the ALJ's discreditation incorrectly references a January 20, 2017, appointment with Ms. Rodriguez and a May 19, 2017, appointment with Dr. Smith, not Dr. Navarro-Gonzalez. (*Id.*). The plaintiff further indicates that assuming the ALJ intended to reference the actual appointments with Dr. Navarro- Gonzalez, the September 14, 2017, examination did not include a mental status examination. (*Id.*). Moreover, the plaintiff points out that the defendant admits that the ALJ incorrectly described Dr. Navarro-Gonzalez's opinion as "inconsistent with her own treatment records that report some completely normal mental status exams" as the records cited were from other physicians. (Tr. 35); (DE #17 at pp. 6-7).

The defendant contends that the ALJ properly evaluated the medical opinion evidence from Dr. Navarro-Gonzalez from January 2019. (Tr. 35, 716-18); (DE #17). Additionally, the

defendant contends that the opinions noted from each of the doctors are inconsistent, and that
although the ALJ agreed the plaintiff had some limitations due to her mental conditions, the ALJ
correctly found that the severity of Dr. Navarro-Gonzalez's opinion was given little weight
because it was inconsistent with her own treatment records. (Tr. 35, 548, 580, 716-18). 20 C.F.R.
§ 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the
more weight [the ALJ] will give to that opinion.").

The defendant argues these points based on the fact that Dr. Navarro-Gonzalez signed off
on the May 19, 2017, examination from Dr. Smith, which showed that the plaintiff's appearance
was appropriate, eye contact was good, attention/concentration was good, the plaintiff was fully
oriented x3 (time, place, person), her fund of knowledge and memory were normal, her mood
was euthymic, affect was appropriate, speech was normal, thought process was logical,
associations were intact, there were no abnormal or psychotic thoughts, judgement was good and
insight was good. (Tr. 35, 548, 549); (DE #17, 09/09/2020, at 6). The defendant also suggests
that because Dr. Navarro-Gonzalez, Dr. Smith, and Ms. Rodriquez all work in the same office,
and that Dr. Navarro-Gonzalez's opinion was inconsistent with previous treatment records, the
ALJ correctly gave little weight to Dr. Navarro-Gonzalez's opinions. (DE #17 at p. 6). In other
words, the defendant contends that although Dr. Navarro-Gonzalez was not the examiner on the
records cited by the ALJ from Borinquen Medical Center as the physician signing off on the May
2017 visit with Ms. Rodriguez, and as a physician at this same institution, Dr. Navarro-Gonzalez
would have had access to these records when she issued her inconsistent medical opinion. (DE
#17 at pp.6-7). The defendant asserts that "it is posited that in stating that Dr. Gonzalez's opinion
was inconsistent with her treatment records, the ALJ was likely referring to records from
Borinquen Medical Center, where she was employed with other examiners". (DE #17 at pp. 6-

7).  The defendant's *post hoc* rationale and re-writing of the ALJ's decision should be rejected. *See Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) (holding "[w]e decline, however, to affirm simply because some rationale might have supported the ALJ's conclusion. Such an approach would not advance the ends of reasoned decision making.") (*citing SEC v. Chenery Corp.,* 318 U.S. 80, 94, (1943)).

On May 19, 2017, Dr. Smith noted that the plaintiff had made minimal progress toward treatment goals and in the session notes, Dr. Smith documented that the plaintiff "states she is not feeling better." (Tr. 549). The ALJ instead only focuses on the selectively "normal" portions of the findings, but the entire medical record should be considered. *See Cox*, 933 at 177.

The undersigned also notes that the ALJ indicated that "the severity of [Ms. Rodriguez's] report is inconsistent with the reports elsewhere in the record and the claimant's own evidence that shows she has a friend she sees regularly …, and she goes to church." (Tr. 35).  Moreover, the ALJ indicated that with respect to the opinion of Dr. Navarro-Gonzalez, '[t]he severity of marked limitations is inconsistent with the claimant's ability to engage in activities such as take the bus, go to church services, pray, spend time with a friend, go to the mall, complete chores, and watch television."  (*Id.*).  In reality, however, the plaintiff's anxiety and depression impaired her ability to leave the house except on a rare basis or consistently perform basic activities of daily living such as cooking and bathing; additionally, the plaintiff's tasks of leaving the house for church, housework, and walking were part of her therapy to confront her depression and anxiety. (Tr. 55-56, 58, 256-57, 275, 302, 375, 449, 451, 544, 700, 705). The friend that the plaintiff saw once a week went to the plaintiff's house to see her because "she does not want to come out of the house" and that friend also reported the plaintiff did not perform household chores or regularly perform self-care. (Tr. 312-13). The ALJ's use of the plaintiff's minimal

activities to support the ALJ's finding is improper, because the ALJ did not use all the pertinent information surrounding the plaintiff's minimal activities.  The ALJ's "selective description of the plaintiff's activities is disingenuous, as he accepts her listing of her activities, but not her limiting description of them." *Horton v. Barnhart*, 469 F. Supp. 2d 1041, 1047 (N.D. Ala. 2006).

The defendant does not dispute that the DDS medical opinions, taken alone, do not constitute substantial evidence to support the ALJ's decision. The undersigned finds that the ALJ mistakenly rejected the treating source's opinion based on an error of fact and selectively cited the medical evidence of record generally.  Accordingly, the ALJ's findings as a whole were undermined. The presence of DDS opinions does not render the flawed evaluation harmless as they were not only based on an incomplete record, but more importantly not adopted by the ALJ.

The actual explanation provided by the ALJ does not meet the standard established to "clearly articulate the reasons for giving less weight to the opinion of a treating physician," and as such constitutes reversible error. *See e.g., MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The undersigned finds that given the essential errors in the ALJ's consideration of the medical evidence, along with the selective citation of the evidence, the ALJ's rejection of treating physician Dr. Navarro-Gonzalez's opinion was erroneous.

Accordingly, the undersigned finds that remand is merited so that the ALJ may properly consider all the medical evidence and opinions of record. Therefore, the undersigned recommends remand for reconsideration of the medical evidence and opinions of record.

## II.   **The ALJ's Decision Does Not Sufficiently Address Headache-Related Limitations.**

The plaintiff asserts that the ALJ's decision "does not sufficiently explain how the plaintiff's severe headaches were accounted for in the RFC finding, resulting in an inconsistency between

the Step two and RFC determination." (DE# 16, at p, 20).  The ALJ found, at Step two, that the plaintiff's headaches were one of her severe impairments.  (Tr. 28).  A severe impairment is one that "significantly limits your physical or mental ability to do basic work activities".   20 C.F.R. § 416.920(c).  A severe impairment would, accordingly, result in functional limitations.  "The residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments. 20 CFR § 404.1545(a)." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). While an ALJ is "not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported", *Crawford v. Comm'r Of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004), the hypothetical must include all of the credited findings/plaintiff's impairments.  *See, Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002).

In determining the RFC, the ALJ explained, "the undersigned finds the claimant's headaches/migraines to be severe. They are considered in her residual functional capacity finding that she should avoid concentrated exposure to vibration and hazards including work at unprotected heights." (Tr. 35). The undersigned finds that, having found headaches to be a severe impairment, the ALJ needed to account for the related limitations in the RFC finding.

The defendant asserts that "the RFC finding accounted for the plaintiff's headaches," but this is based on the ALJ's statement that: "the undersigned finds the claimant's headaches/migraines to be severe. They are considered in her residual functional capacity finding that she should avoid concentrated exposure to vibration and hazards including work at unprotected heights." (Tr. 35); (DE #17 at p. 13). However, the plaintiff continued to have headaches with significant related symptoms three to four times a week even when not working at all; she also repeatedly stated that her headaches/migraines lasted at least half a day to more

than a day, and resulted in the need to lie down, phonophobia, photophobia, and nausea, in addition to severe pain. (Tr. 60, 251, 299-300, 306, 651). This undermines the defendant's assertion that the existing RFC limitations for other impairments would sufficiently account for her headaches. (DE #16 at pp. 20-21).

The defendant also implies that the plaintiff's headaches could be discredited because "her physical exam was normal." (DE #17 at p. 13). This is a *post hoc* rationale that was not provided by the ALJ in reducing the headache-related limitations to vibrations and hazards. A normal physical examination still would not explain the ALJ's conclusion as a normal physical examination does not contradict the presence of headaches. *See e.g., Lindsey v. Colvin*, 208 F. Supp. 3d 1239, 1245-49 (N.D. Ala. 2016) (noting that migraine headaches do not need to be proven through objective findings). Additionally, the defendant does not contest the plaintiff's assertions that the ALJ erroneously found it significant that the plaintiff "has not been diagnosed with migraines" even though the nature and frequency of her headaches was documented by treating sources. (DE #16 at p. 21). The undersigned notes that the defendant's *post hoc* assertion that the ALJ accounted for headaches in addressing the mental impairments is merely inferred by the defendant and is not stated or implied in the ALJ's decision.

Although the ALJ provided rationale for rejecting the plaintiff's allegations of headaches, the rationale is not only inconsistent with the step two finding but is also not supported by substantial evidence. The ALJ found that the plaintiff "did not report any problems with [headaches] to her doctor in March 2017" and "also did not complain of disabling headaches to her mental health provider in 2017[.]" (Tr. 33) (citing Tr. 400 and Tr. 528-80). However, the treatment records cited by the ALJ dates to March 2017, and the plaintiff reported her headaches did not worsen until July of 2017. (Tr. 649). By April 2017, Ms. Rodriguez first noted that the

plaintiff's headaches were an issue. (Tr. 272, 279). Additionally, in August 2017, Dr. Camacho specified that Plaintiff "[complained of] worsening [headache]s (frequency and severity and referred her to a neurologist." (Tr. 588-89). In September 2017, the plaintiff again reported headaches as a problem, although she attributed them to the psychiatric medications. (Tr. 705).

There is a conflict between the ALJ's finding that the plaintiff's headache disorder was a severe impairment and the lack of headache-related limitations in the RFC finding. Accordingly, the undersigned finds that remand is warranted for the proper evaluation of the plaintiff's headache disorder.

**III.** **The Rationale for Rejecting the Plaintiff's Allegations Is Unsupported by Substantial Evidence.**

The undersigned finds that the ALJ erroneously found that the plaintiff's allegations were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 32). The reasons articulated for disregarding a claimant's subjective testimony must be based upon substantial evidence. *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991). Here, the undersigned finds they are not. As noted in supra Arguments I and II, the ALJ did not properly consider the clinical documentation of the plaintiff's abnormal mental status examinations or the plaintiff's headache-related limitations. Therefore, a remand is warranted for reassessment of the plaintiff's allegations.

## CONCLUSION AND RECOMMENDATION

The undersigned finds that the ALJ's findings and ultimate decision were not based on substantial evidence. In accordance with the foregoing, it is

**RESPECTFULLY RECOMMENDED** that the Plaintiff's Motion for Summary Judgment (DE #16, 08/10/2020) be **GRANTED,** the Defendant's Motion for Summary

Judgment (DE #17, 09/09/2020) be **DENIED**, and the decision of the Commissioner denying benefits to the plaintiff be **REMANDED** under sentence four of 42 U.S.C. § 405(g) so that the ALJ can properly consider the clinical documentation of the plaintiff's mental status examinations, properly assess the plaintiff's headache disorder, and reassess the plaintiff's allegations.

The parties will have fourteen (14) days from the date of receipt of this Report and Recommendation to file written objections, if any, with the Honorable Ursula Ungaro, United States District Court Judge. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary, in the interest of justice. See 28 U.S.C § 636(b)(1); *Harrigan v. Metro Dade Police Dep't Station* #4, 977 F.3d 1185, 1191-1192 (11th Cir. 2020); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

RESPECTFULLY SUBMITTED, in Chambers, this 26th day of January 2021.

CHIEF U.S. MAGISTRATE JUDGE
JOHN J. O'SULLIVAN